BRIAN J. STRETCH (CABN 163973)
Acting United States Attorney

DAVID R. CALLAWAY (CABN 121782)
Chief, Criminal Division

HARTLEY M. K. WEST (CABN 191609)
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-6747
     Fax:  (415) 436-7234
     Hartley.West@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 14-437-1 CRB |
| Plaintiff, | |
| v. | UNITED STATES' SENTENCING MEMORANDUM |
| JESSE J. AMARAL, JR., | |
| Defendant. | |

U.S. SENTENCING MEMORANDUM
CR 14-437-1 CRB

1

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................1

    A.    Defendant ...............................................................................................1

    B.    The Federal Meat Inspection Act ..........................................................1

DISCUSSION ......................................................................................................................2

    A.    Offense Conduct ....................................................................................2

        1.    The Conspiracy to Distribute Adulterated, Misbranded, and Uninspected Meat ...................................................................2

            a.    Amaral's Admissions .....................................................2

            b.    Codefendants' Admissions .............................................2

            c.    The Recall ......................................................................4

        2.    The Fraudulent Invoicing Scheme ...........................................5

            a.    Amaral's Admissions .....................................................5

            b.    Codefendants' Admissions .............................................5

    B.    Relevant Conduct ..................................................................................6

SENTENCING GUIDELINES CALCULATION ...............................................................6

ARGUMENT .......................................................................................................................7

    A.    Nature and Circumstances of Amaral's Offenses ................................7

    B.    Amaral's History and Characteristics ...................................................9

    C.    Lack of Sentencing Disparity ................................................................9

    D.    Sixty Months Is Sufficient But No Greater Than Necessary ..............10

RESTITUTION ..................................................................................................................10

CONCLUSION ..................................................................................................................11

# TABLE OF AUTHORITES

## CASES

*United States v. Booth,*
    309 F.3d 566 (9th Cir. 2002) ........................................................................... 7

*United States v. Carter,*
    560 F.3d 1107 (9th Cir. 2009) ....................................................................... 10

*United States v. Jensen,*
    No. 1:13-01138 MEH (D. Co.) ........................................................................ 9

*United States v. Quality Egg,*
    No. 3:14-03024 MWB (N.D. Ia.) ..................................................................... 9

*United States v. Si,*
    343 F.3d 1116 (9th Cir. 2003) ......................................................................... 7

## STATUTES

18 U.S.C. § 3553 ............................................................................................ 7, 10

18 U.S.C. § 3663 .............................................................................................. 10

21 U.S.C. § 331 ................................................................................................. 9

21 U.S.C. § 333 ................................................................................................. 9

## RULES

U.S.S.G. § 1B1.2 ............................................................................................... 5

U.S.S.G. § 2B1.1 ............................................................................................... 6

U.S.S.G. § 3B1.1 ....................................................................................... 3, 6, 7

**INTRODUCTION**

The defendant led an outrageous scheme to distribute adulterated meat from condemned and uninspected cattle – resulting in a nationwide 8.7 million pound recall – and to steal from local farmers on the side.  The government's recommended prison sentence of sixty months reflects the seriousness of his crimes and meets the statutory goals of punishment, deterrence, and protecting the public, while taking into account defendant's advanced age, poor health, and apparent prior law-abiding life.

**BACKGROUND**

**A.     Defendant**

Defendant Jesse J. ("Babe") Amaral, Jr. was the President and sole shareholder of Petaluma-based Rancho Feeding Corporation.  He and three others were charged with violating the Federal Meat Inspection Act (FMIA), as well as conspiracy and mail fraud, arising out of Rancho's distribution of adulterated, misbranded, and uninspected meat.  His scheme resulted in a nationwide recall of more than 8.7 million pounds of beef and veal products.  Amaral was also indicted for a mail fraud scheme to falsely invoice farmers who consigned their cattle.

Amaral admitted guilt only after all of his co-conspirators had pled guilty and agreed to cooperate.  He pled to a single count of conspiracy to violate the FMIA, contesting the losses caused by his scheme, the number of victims, and his role in the offense.  The parties have since stipulated to loss and victim guidelines.  Amaral has settled many of the claims against him, and thus few victims have submitted impact statements.  Declaration of Hartley M. K. West (West Dec.) at ¶ 3, Exh. 2.  Certain restitution issues, however, remain.

**B.     The Federal Meat Inspection Act**

The FMIA was enacted to protect the health and welfare of consumers.  Together with its implementing regulations, the FMIA requires inspection both before and after slaughter of all livestock and carcasses that could be used as human food.  The ante mortem (pre-slaughter) inspection requires designation as "U.S. Suspect" any cattle suspected of being affected with a condition that could cause condemnation of the carcass on post mortem (post-slaughter) inspection.  One such condition is epithelioma of the eye, also known as cancer eye.  The FMIA requires all unadulterated carcasses and parts to be marked "Inspected and passed."  Adulterated carcasses and parts are labeled "Inspected and

condemned" and destroyed.

Under the FMIA and its regulations, cattle carcasses, carcass parts, and meat are deemed "adulterated" if for any reason they are unsound, unhealthful, or otherwise unfit for human food. Such items are deemed "misbranded" if they bear labeling that is in any way false or misleading. The FMIA prohibits the sale and transport in commerce of adulterated or misbranded cattle, carcasses, and carcass parts that are capable of use as human food, as well as the sale and transport of any articles required to be inspected that were not so inspected and passed. The U.S. Department of Agriculture (USDA), Food Safety and Inspection Service (FSIS) is responsible for these inspections.

## DISCUSSION

**A.      Offense Conduct**

       1.   The Conspiracy to Distribute Adulterated, Misbranded, and Uninspected Meat

          a.   Amaral's Admissions

In pleading guilty, Amaral admitted that, beginning in mid to late 2012 and continuing through January 10, 2014, he participated in a conspiracy to distribute adulterated, misbranded, and uninspected meat. Specifically, he knowingly and with intent to defraud directing Rancho employees: (1) to process for human consumption cattle that had been condemned by the USDA veterinarian; (2) to circumvent inspection procedures for certain cattle exhibiting symptoms of cancer eye (known as "eye cows"); and (3) to process these eye cows for human consumption without full inspection. In furtherance of this conspiracy, Amaral admitted, Rancho employees distributed carcasses, carcass parts, and meat from three condemned cattle on or about April 16, 2013, and from two eye cows that had not undergone complete USDA inspections on or about January 10, 2014. Amaral Plea Agr. ¶ 2.

          b.   Codefendants' Admissions

Three of Amaral's colleagues pled guilty to FMIA violations arising out of this same scheme. Their admissions of guilt establish that Amaral led a scheme that involved five or more participants or was otherwise extensive.

Felix Sandoval Cabrera was Rancho's foreperson and reported directly to Amaral. He was responsible for the staff and operations of Rancho's kill floor, and for "knocking" cattle – the process by which cattle are stunned prior to slaughter. In pleading guilty, Cabrera described how Amaral directed

1    the scheme.  Amaral instructed him which condemned cattle to process for transport, sale, and

2    distribution.  Cabrera then directed kill floor employees to carve "USDA Condemned" stamps out of the

3    cattle carcasses and to process them for distribution.  Cabrera Plea Agr. ¶ 2.

4         Cabrera also described in his Plea Agreement how Amaral directed him and Rancho's yardman,

5    Eugen Corda, to circumvent inspection procedures for eye cows.  Amaral, or Cabrera at Amaral's

6    instruction, would identify uninspected eye cows to swap with cattle that had already passed ante

7    mortem inspection and were awaiting slaughter.  Corda would bring the eye cows to the kill chute,

8    where Cabrera would knock them.  Then Cabrera or another kill floor employee at Cabrera's instruction

9    would slaughter the cows, deposit their heads in the gut bin, and place reserved heads from apparently

10   healthy cows next to the eye cow carcasses.  This switch and slaughter of uninspected eye cows

11   occurred during the inspectors' lunch breaks, a time during which plant operations were supposed to

12   cease, and Cabrera believed the inspectors were unaware that the carcasses they were inspecting

13   belonged to cancer eye cows that had escaped ante mortem inspection.  *Id.*

14        Cabrera agreed that, between January 2013 and January 2014, Rancho processed and distributed

15   for human consumption carcasses, carcass parts, and meat from approximately 101 condemned cattle

16   and approximately 79 eye cows.  According to Cabrera, at some point during the conspiracy, at Amaral

17   and Singleton's instructions, Rancho began compensating him for each condemned carcass or

18   uninspected eye cow carcass he facilitated Rancho distributing.  *Id.*  Cabrera agreed that he was an

19   organizer, manager, or supervisor of this criminal activity, warranting a two-level sentencing

20   enhancement.  *Id.* at 7 (citing U.S.S.G. § 3B1.1(c)).

21        Eugene Corda, Rancho's primary yardperson, also reported directly to Amaral.  He was

22   responsible for receiving cattle and moving them for inspection and slaughter.  Corda was involved in

23   the eye cow processing; his account of events is consistent with Cabrera's.  At Amaral's instruction,

24   both directly and then through Cabrera, Corda moved cattle exhibiting signs of cancer eye into outdoor

25   holding pens.  Corda saw Amaral move eye cows from their holding pens to the kill chute, switching

26   them with cattle that had already undergone ante mortem inspection.  After several months, Amaral

27   directed Corda to switch uninspected eye cows with cattle that had already been inspected.  At some

28   point, Amaral began instructing Corda to bring uninspected eye cows to the kill chute without switching

U.S. SENTENCING MEMORANDUM
CR 14-437-1 CRB                    3

1  them for inspected cattle.  Corda did so, understanding that once cattle were in the kill chute, the only

2  place they could go was the kill floor, where they would be slaughtered and sold.  Corda Plea Agr. ¶ 2.

3       Robert Singleton, the owner of Rancho Veal Corporation, was primarily responsible for

4  purchasing cattle for Rancho Feeding and loading shipments of processed cattle for distribution.  He also

5  assumed some management responsibilities at Rancho Feeding when Amaral was unavailable.

6  Singleton Plea Agr. ¶ 2.  Singleton was the first defendant to plead guilty in the Rancho investigation

7  and was charged by Information.  *Id.* at ¶ 1.

8       Singleton admitted that, beginning no later than January 2013 and continuing through on or

9  about January 10, 2014, together with Amaral, Cabrera, Corda, and other Rancho employees, he

10  engaged in a scheme to defraud Rancho's customers and the consuming public by knowingly and

11  intentionally selling and transporting cattle carcasses, carcass parts, and meat that were adulterated,

12  misbranded, and/or uninspected.  He knew that Amaral had instructed Cabrera to direct kill floor

13  employees to carve "USDA Condemned" stamps out of condemned cattle and to process the carcasses

14  for distribution.  *Id.* at ¶ 2.

15       Singleton also knew that Corda, at Amaral's direction, swapped uninspected cattle showing

16  symptoms of cancer eye for cattle that had already passed ante mortem inspection and were awaiting

17  slaughter.  Singleton understood that Cabrera knocked the cattle showing symptoms of cancer eye, and

18  that he or another kill floor employee at his instruction slaughtered these cattle and deposited their heads

19  in the gut bin.  He agreed that Cabrera, or another kill floor employee at Cabrera's instruction, placed

20  healthy cow heads next to the eye cow carcasses, and that this switch and slaughter of uninspected cattle

21  occurred during the inspectors' lunch breaks.  *Id.*

22       Singleton admitted that he and Amaral paid Cabrera approximately $50.00 for each condemned

23  carcass or uninspected cancer eye cow that Rancho sold.  *Id.*  Singleton agreed that he was a manager or

24  supervisor of criminal activity involving five or more participants or that was otherwise extensive,

25  meriting a three level sentencing enhancement.  *Id.* at ¶ 7.

26       c.   <u>The Recall</u>

27       FSIS investigates claims of adulteration in meat and poultry through recall committees.  If the

28  claims are founded, the recall committee determines the appropriate food safety classification and scope,

1   that is, the number of pounds of product produced over a defined timeframe for the recall.  The company

2   under investigation is given an opportunity to provide facts pertaining to classification and scope and

3   thereby limit the extent of the recall.  After providing this opportunity for discussion, the recall

4   committee informs the company of the final scope and classification and invites it to conduct a voluntary

5   recall of this same scope.  Approximately 99% of the time, the company agrees to a voluntary recall.  If

6   the company declines voluntary recall, then FSIS has the authority to detain and seize the affected

7   product.  Declaration of William Smith, ¶ 3.

8        In the case of Rancho Feeding, the recall committee determined that beef and veal products

9   processed between January 1, 2013, through January 7, 2014, totaling approximately 8,742,700 pounds,

10   were subject to a Class I recall.  "Class I" means that the adulteration presents a health hazard situation

11   in which there is a reasonable probability that eating the food will cause health problems or death or is

12   for any other reason unsound, unhealthful, or otherwise unfit for human food.  *Id.* at ¶ 4.  Rancho

13   Feeding agreed to voluntarily recall this product.  Had Rancho Feeding not consented to the voluntary

14   recall, FSIS was prepared to detain and seize the entire scope of the recalled product.  *Id.* at ¶ 5.

15        2.   The Fraudulent Invoicing Scheme

16          a.   Amaral's Admissions

17        Amaral admitted as part of his plea that he defrauded farmers through a false invoicing scheme,

18   using the mails, beginning in at least 2012 and continuing through January 2014.  Amaral Plea Agr. ¶ 2.

19   While this conduct does not underlie the count of conviction, it is explicitly admitted and therefore

20   treated under the Sentencing Guidelines as if Amaral had been convicted of it.  U.S.S.G. § 1B1.2(c).

21          b.   Codefendants' Admissions

22        Singleton admitted agreeing with Amaral to send the fraudulent cattle invoices.  He explained

23   that Amaral would falsely advise farmers that their cattle had died or been condemned, knowing that the

24   cattle had in fact been sold for human consumption.  Then Amaral would create or cause others to create

25   invoices falsely representing the number of cattle that had been slaughtered and distributed for sale,

26   often charging handling fees for the "dead" cattle.  Singleton estimated that Rancho sent fraudulent

27   invoices for approximately seventeen cattle.  Singleton Plea Agr. ¶ 2.

28   / / /

U.S. SENTENCING MEMORANDUM
CR 14-437-1 CRB                    5

**B.     Relevant Conduct**

While Amaral admitted causing the sale and distribution of three condemned cattle and two uninspected eye cows, Cabrera's Plea Agreement establishes that Amaral was responsible for Rancho's processing and distribution of meat from approximately 101 condemned cattle and approximately 79 cancer eye cows.  Similarly, Singleton's Plea Agreement establishes that Amaral's admitted fraudulent invoicing scheme involved approximately seventeen cattle.  A full review of the Rancho records, which was not yet complete at the time of the plea, reveals fraud in invoicing as to twenty-two cattle.  West Dec. at ¶ 2, Exh. 1.

### SENTENCING GUIDELINES CALCULATION

The parties have agreed to the following advisory guideline calculation, pursuant to the Plea Agreement and the Stipulation filed January 26, 2016.  Amaral has reserved his right to argue that the aggravating role enhancement should be +3 under U.S.S.G. § 3B1.1(b), rather than +4 under U.S.S.G. § 3B1.1(a).  The 2015 Guidelines Manual applies.

|   |   |   |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B1.1(a)(2): | 6 |
| b. | Specific offense characteristics: | |
|    | Loss, § 2B1.1(b)(1)(J) | +18 |
|    | Victims, § 2B1.1(b)(2)(C) | +6 |
| c. | Adjustments: | |
|    | Aggravating role, § 3B1.1(a)/(b) | +4/+3 |
| d. | Acceptance of Responsibility: | -3 |
| e. | Adjusted Offense Level: | 31/30 |

The admissions of Singleton, Cabrera, and Corda establish by at least a preponderance of the evidence that Amaral organized and led a conspiracy involving five or more participants that was otherwise extensive.  U.S.S.G. § 3B1.1(a).  Amaral personally directed the conduct of Singleton, Cabrera, and Corda.  He also instructed Cabrera to direct other kill floor employees to process condemned cattle and eye cows, and to switch heads for the eye cow post mortem inspections.  To bring the scheme to fruition with the ultimate sale and distribution of the adulterated meat, Amaral required the services of many unknowing Rancho employees, rendering it "otherwise extensive."  U.S.S.G. § 3B1.1, App. N. 3.  Amaral exercised decision making authority over the scheme, as all codefendants

1  agree, and all Rancho Feeding employees reported to him.  Moreover, as the sole shareholder of Rancho

2  Feeding, Amaral also stood to profit more than his employees.

3       These facts support a four-level organizer/leader enhancement.  *See United States v. Si*, 343 F.3d

4  1116, 1127 (9th Cir. 2003) (affirming 4-level organizer/leader enhancement where "defendant

5  determined when and how much to pay robbery crew, initiated idea of robbery, decided how the robbery

6  would occur, gave instructions to coconspirator to communicate to the crew, and stood to receive a

7  larger share of the profits than some of the other coconspirators"); *United States v. Booth*, 309 F.3d 566,

8  577 (9th Cir. 2002) (affirming scheme otherwise extensive due to "involvement, albeit unknowing, of

9  more than ten employees and the geographical reach of the scheme"); *see also* U.S.S.G. § 3B1.1, App.

10  N. 4.

11       At Offense Level 31 and Criminal History Category I, the advisory guideline range is 108-135

12  months imprisonment and a $30,000 to $300,000 fine.

13  **ARGUMENT**

14       Title 18, United States Code, Section 3553(a) requires the court to "impose a sentence sufficient,

15  but not greater than necessary" after considering "the nature and circumstances of the offense and the

16  history and characteristics of the defendant"; the need for the sentence to reflect the seriousness of the

17  offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the

18  public, and provide the defendant with training, medical care, or other correctional treatment; the

19  Sentencing Guidelines; and the need to avoid unwarranted sentencing disparity between similarly

20  situated defendants.

21  **A.**    **Nature and Circumstances of Amaral's Offenses**

22       The nature and circumstances of Amaral's offenses are disturbing and serious.  Amaral ordered

23  slaughterhouse employees – poorly educated individuals reliant on Amaral for their meager wages – to

24  carve "USDA Condemned" stamps out of the flesh of slaughtered cattle and to process these condemned

25  carcasses.  He also ordered such employees to swap and slaughter uninspected eye cows behind

26  inspectors' backs, and then to trick the inspectors by putting heads of healthy cows next to the

27  decapitated eye cows.  At his direction, Rancho employees processed and distributed meat from

28  approximately 101 condemned cattle and approximately 79 eye cows, triggering a massive nationwide

1    recall of more than 8.7 million pounds of beef product.

2        In addition, Amaral cheated local farmers who consigned their cattle to Rancho by sending them

3    fraudulent cattle invoices, falsely telling them that their cattle had died or been condemned, when

4    Rancho records prove that the cattle were slaughtered and sold.

5        Only a serious sentence can reflect the seriousness of these offenses, promote respect for the law,

6    provide just punishment, afford adequate deterrence, and protect the public.  Amaral's crimes were not

7    mere regulatory violations, oversights, or a matter of just looking the other way.  His conduct comprised

8    a series of knowing, intentional, and corrupt decisions to cheat and abuse the USDA's inspection

9    system, again and again over the course of more than a year.  Amaral had no regard for the

10    consequences of his scheme or for the companies who bought his product believing it to be wholesome,

11    incorporating it into their own products and selling it to downstream victims – grocery stores,

12    restaurants, and individual consumers.

13        The massive losses stemming from Amaral's scheme are one measure of the seriousness of his

14    offense.  Many such losses were not fully tallied by Rancho's victims at the time of Amaral's Plea

15    Agreement, in which the government agreed to recommend a loss enhancement no higher than 18.  The

16    government stands by this agreement, and the parties now jointly stipulate to a loss enhancement of 18,

17    or more than $3.5 million, for purposes of the sentencing calculation.  Dkt. 98.

18        Four companies purchased directly from Rancho: Argus Food Processing Corp., AdvancePierre

19    Foods, Tillamook Country Smokers, Inc., and RBR Meat Company, Inc. ██████████████

20    ████████████████████████████████████████████ Rancho's

21    dealings with RBR offer a good example of how its meat was distributed.  RBR, organized in 1956, is a

22    cow boning operation.  Declaration of Irwin Miller, ¶ 2.  RBR purchases hind and fore quarters, removes

23    the bones, and sells the meat predominately to companies that grind it into hamburger and distribute it

24    downstream to other food processing companies as well as to grocery and restaurant chains.  *Id.*  RBR

25    also produces a few cuts of meat, which are resold to distributors, which in turn sell to retailers, which

26    sell to consumers.  *Id.*  RBR generally sells lean meat, which its buyers then combine with fattier meat to

27    reach the desired fat percentage in the final product.  *Id.*  As a result Amaral's scheme, RBR had to

28    recall 6.3 million pounds of meat.  *Id.* at ¶ 3.

U.S. SENTENCING MEMORANDUM
CR 14-437-1 CRB          8

1    Another direct victim of Amaral's scheme is BN Ranch, operated by Bill Niman (formerly of

2    Niman Ranch).  Declaration of Bill Niman (Niman Dec.), ¶ 1.  BN Ranch sells 100 percent grass-fed,

3    hormone-free beef from its own cattle raised on its ranches in Northern California and slaughtered at

4    Rancho Feeding.  *Id.* at ¶ 2.  Committed to the humane slaughter of animals, a BN Ranch employee –

5    sometimes Niman himself – personally oversaw all slaughters at Rancho.  *Id.*  Despite these precautions,

6    BN Ranch's beef was encompassed in the FSIS recall, adulterated by virtue of being processed at the

7    same facility as the condemned and uninspected cattle.  BN Ranch estimates its direct losses at

8    $785,030.67 and its indirect losses at $5,500,000.00.  *Id.* at ¶¶ 3-4.

9    **B.    Amaral's History and Characteristics**

10         Amaral's history and characteristics are also a factor in determining the appropriate sentence.

11   Seventy-eight years old with a high school education, Amaral has had multiple heart attacks, melanoma,

12   and a host of other ailments.  He enjoyed a good reputation in the community, until this case shut

13   Rancho's doors.  The United States took all these factors into account in allowing Amaral to plead guilty

14   to conspiracy, with a five year statutory maximum – well below the advisory guideline range.

15   **C.    Lack of Sentencing Disparity**

16         Arguing the need to avoid sentencing disparity, Amaral likens his case to two charged under the

17   Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 331(a) and 333(a)(1).  Amaral Sentg. Mem. at 13.  In

18   *United States v. Jensen*, No. 1:13-01138 MEH (D. Co.), defendants were sentenced to probation for six

19   misdemeanor distributions of adulterated cantaloupes over the course of one month.  In *United States v.*

20   *Quality Egg*, No. 3:14-03024 MWB (N.D. Ia.), the corporate defendant was sentenced to probation and

21   the individual defendant to three months' imprisonment for a single misdemeanor count of introducing

22   adulterated eggs over an eight month period.  But neither *Jensen* nor *Quality Egg* involved a scheme to

23   defraud.  In contrast, Amaral led a scheme to defraud over more than a year.  This distinction is critical;

24   it renders his crime a felony, as opposed to the misdemeanor conduct in *Jensen* and *Quality Egg*, and far

25   more serious.  Thus, Amaral is not similarly situated to these defendants.

26         Amaral also contends that he should receive a sentence "no more severe than his co-participants'

27   sentences."  Amaral Sentg. Mem. at 14.  This argument fails, too, as Amaral and his co-conspirators are

28   not similarly situated, both because of their differing roles in the offense and because Amaral admitted

1   guilt only after every co-conspirator pled guilty and agreed to cooperate with the United States. *See*

2   *United States v. Carter*, 560 F.3d 1107, 1121 (9th Cir. 2009) (cooperating co-conspirators were not

3   similarly situated; "a sentencing disparity based on cooperation is not unreasonable"). The government

4   will seek to ensure that the co-conspirators are sentenced commensurate with their roles in the offense

5   and taking their cooperation into account. And Amaral's assertion that he was never invited to

6   cooperate is flat false, as his counsel well knows. West Dec. at ¶ 5.

7   **D.     Sixty Months Is Sufficient But No Greater Than Necessary**

8         For all these reasons, the United States believes that a sentence of sixty months, the statutory

9   maximum for the negotiated offense of conviction and well below the advisory guidelines range, is

10  sufficient  but not greater than necessary to achieve the goals of § 3553(a). Such a sentence honors the

11  seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate

12  deterrence, protects the public, accounts for the defendant's history and characteristics, and reflects the

13  principles of the Sentencing Guidelines. The government agrees with the Probation recommendation of

14  a two year term of supervised release.

15        The government believes that defendant's assets are better spent on restoring his victims through

16  restitution than through a fine, the same reason it did not include forfeiture in the Plea Agreement.

17                                          **<u>RESTITUTION</u>**

18        Amaral agreed "to pay restitution, in an amount to be set by the Court, for all the losses caused

19  by all the schemes or offenses with which [he] was charged in this case." Amaral Plea Agr. ¶ 9. He

20  further agreed "that the amount of restitution will not be limited to the loss attributable to the count to

21  which [he pled] guilty, pursuant to 18 U.S.C. § 3663(a)(3)." *Id.*

22

23                                                                                                   Four

24  restitution claims thus remain. AdvancePierre claims losses of $584,921.99. West Dec. at ¶ 4. BN

25  Ranch claims direct losses of $785,030.67 and indirect losses of $5,500,000.00. Niman Dec. at ¶¶ 3-4.

26  A representative of BN Ranch will be available at the sentencing hearing to testify, should the Court

27  wish to resolve restitution at that time. Finally, Rancho records show that Amaral defrauded New Hope

28  Dairy of $660.00 and Marilyn Torres of $824.20. West Dec., Exh. 1. The government requests that the

1    Court order restitution reflecting this total, $6,871,436.86.

2    <u>**CONCLUSION**</u>

3    Amaral's serious crimes demand a serious sentence.  The United States recommends that the

4    Court sentence defendant Amaral to a term of sixty months imprisonment, two years supervised release,

5    a $100 special assessment, and restitution of $6,871,436.86.

6

7    Dated:  February 1, 2016                                    Respectfully submitted,

8                                                               BRIAN J. STRETCH
                                                                United States Attorney
9
                                                                     /s/
10
                                                                _____
11                                                              HARTLEY M. K. WEST
                                                                Assistant United States Attorney

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28